# EXHIBIT A

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br><br>COUNTY OF SUMTER<br><br>Roosevelt Moses,<br><br>      Plaintiff,<br><br>v.<br><br>Wilkes Contract Services, LLC, Unicon, Inc., and P3 Concepts, Inc.,<br><br>      Defendants. | IN THE COURT OF COMMON PLEAS<br>THIRD JUDICIAL CIRCUIT<br><br>CASE NO. 2017-CP-43-_____<br><br><br>**SUMMONS** |

TO THE DEFENDANT ABOVE NAMED:

  YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy of which is served upon you, and to serve a copy of your answer to this Complaint upon the subscriber at the address shown below within thirty (30) days (thirty-five (35) days if served by United States Mail) after service hereof, exclusive of the date of such service, and if you fail to answer the Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

                **CROMER BABB PORTER & HICKS, LLC**

                BY: *s/Shannon M. Polvi*
                  Shannon Polvi (SC Bar #101837)
                  1418 Laurel Street, Suite A (29201)
                  Post Office Box 11675
                  Columbia, South Carolina 29211
                  Phone 803-799-9530
                  Fax  803-799-9533
                  *Attorneys for Plaintiff*

October 6, 2017
Columbia, South Carolina

1

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br><br>COUNTY OF SUMTER<br><br>Roosevelt Moses,<br><br>                Plaintiff,<br><br>v.<br><br>Wilkes Contract Services, LLC, Unicon, Inc., and P3 Concepts, Inc.,<br><br>                Defendants. | IN THE COURT OF COMMON PLEAS<br>THIRD JUDICIAL CIRCUIT<br><br>CASE NO.: 2017-CP-43-_____<br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

## EMPLOYMENT CASE

Plaintiff, complaining of Defendants herein, would respectfully allege as follows:

## PARTIES & JURISDICTION

1. Plaintiff, Roosevelt Moses ("Moses"), is a black male, citizen and resident of Sumter County, South Carolina. Moses is also commonly known as Clint.

2. Defendant Wilkes Contract Services, LLC, a subsidiary of Unicon, Inc., formerly employed Moses in Sumter County in the State of South Carolina with enough employees to be subject to liability. Defendant is a trucking company with its home office located in Marshville, North Carolina. Defendant provides various hauling services in several states including South Carolina.

3. Defendant Unicon, Inc. is a poultry handling and transportation company headquartered in Marshville, North Carolina.

4. Defendant P3 Concepts, Inc. is a poultry handling and transportation company headquartered in Marshville, North Carolina.

5. Defendant Unicon, Inc., Defendant Wilkes Contract Services, LLC, and Defendant P3 Concepts, Inc. are hereinafter referred to as Defendants.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

6. Defendants are so intertwined to be considered a single legal entity.

7. This action arises under Title VII of the 1964 Civil Rights Act, and amendments thereto, 42 U.S.C. 2000e *et seq.* ("Title VII"), the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-10 *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and amendments thereto.

8. Moses filed charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and the S.C. Human Affairs Commission ("SCHAC") and this action is timely filed.

9. Venue is proper in this Circuit because Moses was employed by Defendants, and the acts giving rise to this action occurred, in Sumter County.

## FACTUAL ALLEGATIONS

10. Moses was an employee of Defendants from around September 2012 until December 9, 2016.

11. Moses primarily worked out of the facility located in Sumter, South Carolina. The facility was used for the transportation of chickens to and from the Pilgrim's Pride processing plant.

12. Moses was hired as an Assistant Manager. Two of Moses' primary duties were supervision of employees, the scheduling of truck drivers between the farms and facilities, and Moses filled in as needed per the needs of the business.

13. In quick succession, Moses was reprimanded and terminated from employment with Defendants on June 27, 2013. Moses was terminated by Tommy Gayle. The termination was not accurate based on Moses' employment.

14. Later, management realized that Moses was an excellent employee and that he was not appropriately fired. Accordingly, they sought to rehire Moses.

15. Moses was called by Eugene Hastie (Unicon Management), Clay Halley (Driver in Sumter, Defendants' employee), and John Murray (the Regional Manager in Delaware). Each of whom asked Moses to return to employment with Defendants. After several months of unemployment, Moses had found new employment and was initially not inclined to return to employment with Defendants largely because of the circumstances surrounding his termination in June of 2013. Defendants essentially campaigned for Moses to return to employment with Defendants; eventually Moses agreed to reemployment.

16. Moses returned to employment with Defendants on or around July 7, 2014.

17. Moses was asked to return as an Assistant Manager to run the Sumter area and "straighten up Crew One". Moses was told they were having problems with Crew One. Management was having problems with Crew One because of several concerns including alcoholism and deficient work performance. Defendants told Moses that they needed his help.

18. After his return to employment with Defendants, Moses managed the back dock of the Sumter facility and performed driving responsibilities.

19. Moses performed truck driving responsibilities more frequently near the end of his employment with Defendants. Moses was basically performing an Assistant Manager job and a truck driving job.

20. Regina Gould ("Gould") was hired as the Field Manager in or around the middle of 2015. Thereafter, Gould was in a supervisory role over Moses.

21. While Gould was Moses' supervisor she "came on to" Moses in a sexual or romantic manner. On multiple occasions, Gould asked Moses out on dates and invited him to go out with her on Saturday nights.

22. Moses declined all of Gould's invitations.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

23. Moses was very uncomfortable with Gould's conduct which amounted to sexual harassment in the workplace by his direct supervisor.

24. Gould became increasingly hostile towards Moses as he declined her unwanted advances.

25. The working relationship between Moses and Gould devolved into threats, lies, and harm to Moses' income.

26. On one occasion, Gould withheld Moses' paycheck while she pushed him to go out with her to get 'some drinks and go dancing' in Columbia. Again, Moses declined Gould's invitation and asked for his paycheck. Eventually, Gould capitulated and gave Moses his paycheck, but her actions towards Moses continued to worsen.

27. Gould took action to cut Moses' pay.

28. Gould's pay change was targeted at Moses. Upon information and belief, Gould did not change the pay of the other employees under her supervision.

29. Moses discovered Gould's retaliatory pay change by reviewing his pay stubs. The change in income was alarming to Moses.

30. On a Tuesday, Moses reported Gould's actions to John Murray ("Murray"), Defendants' Regional Manager in Delaware. Moses made contact with Murray via telephone in the afternoon. Moses had a cordial working relationship with Murray because Murray formerly worked with Moses when he was the head manager at the Sumter facility. Moses felt comfortable contacting Murray about his concerns and knew that Murray was an important leader in the company and would know what to do and how to help Moses with the problems Gould was causing with Moses' employment. Moses reported Gould to Murray. Murray was very concerned about Moses report. Murray informed Moses that he would take action to contact other leaders in the

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

company. Murray told Moses that Defendants' contract with Pilgrim's Pride required that drivers had to make $200 per day. At that time, Moses was driving on a daily basis. The contractual pay for drivers was a minimum requirement to pay Moses.

31.    Murray contacted Todd Hayes ("Hayes"), Defendants' Human Resources Manager, about Moses' call. Moses knows that Murray called Hayes about Moses' report because Moses had a second call with Murray later that day in which Murray informed Moses that he had contacted Hayes about his concerns.

32.    When Murray called Moses about his subsequent call with Hayes, Murray relayed Hayes' instructions to Moses. Hayes instructed Moses to take the rest of the week off of work and that Moses would be paid for that time.

33.    About an hour later, Moses received a call from Ricardo Torres ("Torres"), Defendants' Field Representative overseeing all of the Company's regions. Torres informed Moses that he and Hayes had discussed Moses' report. Moses again relayed his concerns about Gould's conduct. Torres informed Moses that he would visit the Sumter facility later that week on Friday.

34.    Torres told Moses to return to work at the plant, which was a different instruction than he received from Hayes (via Murray). Moses followed the most recent instructions and returned to work and avoided contact with Gould.

35.    Torres and Hayes visited the Sumter facility that Friday. Murray called Moses that Friday morning and informed Moses that he would have a meeting with Torres and Hayes while they were at that the Sumter facility. Murray was calling to confirm that Moses was available to meet with Torres and Hayes at 10am that Friday. Moses confirmed that he was available.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

36. Moses expected to meet with Torres and Hayes alone. However, the meeting included Gould the entire time, she walked into the room right behind Moses. Dwayne Connor ("Connor"), the Regional Manager for the Sumter Facility, was also present during most of the meeting, his arrival to the meeting was about 10 minutes after it had begun.

37. Hayes sat behind a desk and Torres, Gould, Moses, and Connor sat in chairs on the other side of the desk. Hayes leads the beginning of the meeting and tells Moses to explain what was going on. Moses informed them about Gould's actions to cut his pay.

38. Gould's response was to say that Moses could not do his job. Gould proceeded to say that Moses was weak and that he was 'soft'. Moses defended himself and explained why his pay should not be cut.

39. Torres response was to tell Moses, Gould, and Connor to work together more.

40. Hayes informed Gould and Connor that Moses' pay could not be cut.

41. Prior to the meeting, Moses and Gould were working together on a daily basis. They saw one another at Defendants' office on Highway 15S and at the chicken farms around the Sumter area. Hayes and Torres instructed Moses to thereafter work at the back dock of the plant located a couple of miles away on Highway 15S. That instruction from Hayes and Torres did not help Moses because Gould remained his direct supervisor.

42. The meeting concluded with everyone of an accord that Moses would be paid no less than $200 per day for every day that he worked.

43. It was clear to Moses that Gould had polluted Connor's opinion of Moses and both Connor and Gould were seemingly on a mission to make Moses' employment miserable.

44. About a week later, Connor in-person informed Moses that he would only pay him $150 per day. Connor's statements were in direct conflict with the instructions from Hayes and

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

Torres from the recent meeting. Connor then asked Moses whether Moses had called his "old job". Connor said "I'm not firing you, but you should call your old job and ask for it back." Connor was clearly threatening Moses' employment.

45.     Connor threatened Moses' job at least three times over the several weeks following Moses' complaint about Gould and the pay cut.

46.     As Connor had threatened, Moses was then paid $150 per day.

47.     Similarly, Gould still contacted Moses in the workplace and gave him bizarre and demeaning instructions such as telling Moses to stick his finger in the chicken's butt to allegedly ascertain how long the chicken was dead to determine whether Defendants would get a credit on the dead bird or not. Upon information and belief, Gould did not give any such instructions to anyone under his supervision other than Moses.

48.     Moses feared for his job and did not call Torres or Hayes again because of Connor's repeated threats.

49.     Upon information and belief, both Gould and Connor were terminated from employment later that year. But at the time both Connor and Gould had intimated and scared Moses into not speaking out because he was faced with retaliation after his previous complaint.

50.     Juan Flores ("Flores") was hired by Defendants about a month before Connor was terminated from employment. During that time period, Flores was working as the Office Manager at the Sumter facility. Upon information and belief, Gould also sexually harassed Flores during that same time period. On multiple occasions, Flores told Moses about Gould's inappropriate and unwanted advances towards Flores. Moses informed Flores that he had also been sexually harassed by Gould.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

51. Flores told Moses that he was married and was not interested in Gould, using the phrase, "I don't want a second wife." Flores also told Moses that Gould was calling his house at all hours of the night and causing marital problems for him. Flores said that he had to do something about it.

52. Upon information and belief, Flores called Hayes and reported Gould's conduct.

53. Upon information and belief, Gould was fired for her conduct. Defendants would have known that at minimum Gould's conduct was a second offense based on her conduct towards Moses.

54. Flores replaced Connor after his termination.

55. Under Flores' leadership, Moses was the night manager until the end of his employment with Defendants. Flores essentially had Moses working as his management equivalent overseeing the overnight employees of Defendants and its parent company, Unicon. Moses was supervising about 7 employees at the plant, 3 crews of 7 chicken catchers with about 7 employees per crew, and 6 fork lift drivers. In total, Moses was supervising about 34 employees. Performing these duties meant that Moses not only should have been paid $200 a day like the drivers, but a higher income for his additional management duties.

56. Nonetheless, Defendants continued to pay Moses less than he had legally earned.

57. Moses' pay was varying paycheck to paycheck. Nearly every paycheck for Moses was different.

58. Moses was not compensated for the jobs he was performing.

59. Moses was not paid overtime for years of working excess hours beyond 40 hours in a workweek.

60. Moses worked in excess of 40 hours per week on a regular basis.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

61. Two white employees were given the pay rate of $200 per day that Moses was supposed to receive as well. Similarly, the same white employees were allowed to work better hours and go home early and were not expected to work the same number of hours exceeding 40 hours in a workweek as Moses.

62. Moses again reported concerns about his pay to Torres in or around June 2016.

63. Moses complained to Flores about his pay. Moses told Flores that he was supposed to be paid a minimum of $200 a day and asked to be paid appropriately.

64. Flores informed Moses that if he did not like his pay that he should quit.

65. Moses was told that he would receive a safety bonus for continuing to have a safe record.

66. Defendants withheld Moses' safety bonus; yet, upon information and belief, paid a safety bonus to at least two white employees.

67. Defendants assert that Moses was overpaid by $3,800; to the contrary, Moses was underpaid.

68. Hayes told Moses that Defendants were going to hold Moses' safety bonus because of the alleged overpayment of wages to Moses.

69. An unresolved dispute over Moses' pay remained between Moses and Defendants.

70. Moses continued to try to resolve the pay dispute with Defendants by communicating with Flores and Hayes.

71. Defendants willfully underpaid Moses despite his repeated complaints that he was not being appropriately paid.

72. Defendants continued to fail to pay Moses appropriately up to his constructive discharge on or around December 9, 2016.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

73.     Moses' already earned bonus was not paid until after his constructive discharge.

## FOR A FIRST CAUSE OF ACTION
### (Gender Discrimination; 42 U.S.C. § 2000e *et seq*.)

74.     Where not inconsistent herewith, the foregoing are realleged paragraphs.

75.     Moses is male. Moses was sexually harassed by his female supervisor. After Moses opposed the advances of Gould, she reduced Moses' income and subjected him to adverse treatment in the workplace.

76.     Moses was subjected to harassment and a hostile work environment, denial of compensation, and constructive discharge.

77.     Moses sex was the direct and proximate cause of the adverse employment actions taken by Defendants' agents and employees, acting within the course and scope of their duties, which violated the Civil Rights Act of 1964, for which Defendants are liable.

78.     Defendants have violated Moses' rights under Title VII of the Civil Rights Act and has directly and proximately caused her damages, for which it is liable, including: back pay, front pay, retirement benefits, medical and life insurance benefits, and other fringe benefits, compensatory damages including for physical and emotional suffering. Further, Defendants' conduct was willful and wanton and Moses is entitled to punitive damages for the same. Moses also requests pre-judgment interest and attorney's fees and costs of this action.

## FOR A SECOND CAUSE OF ACTION
### (Race Discrimination; 42 U.S.C. § 2000e *et seq*.)

79.     Where not inconsistent herewith, the foregoing are realleged paragraphs.

80.     Moses is black. The adverse employment actions taken by Defendants against Moses, include denial of compensation, harassment and hostile work environment, and constructive discharge; Moses' race was the direct and proximate cause of the adverse employment

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

actions taken by Defendants' agents and employees, acting within the course and scope of their duties, which violated the Civil Rights Act of 1964, for which Defendants are liable.

81. As a direct and proximate result of the violations of his civil rights under Title VII by Defendants, Moses suffered the loss of his job and sustained impairment of his earning capacity as well as reputational and other intangible damages. Defendants are liable to Moses for the following: back pay; front pay; lost benefits; compensatory damages for pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses; attorney's fees and costs; pre-judgment interest; and punitive damages because Defendants, through its agents and employees, acted with malice, willfulness, or reckless disregard for Moses' federally protected rights.

**FOR A THIRD CAUSE OF ACTION**
**(Violation of the S.C. Payment of Wages Act, S.C. Code Ann. § 41-10-10 *et seq.*)**

82. Where not inconsistent herewith, the foregoing are realleged paragraphs.

83. Defendants are employers as defined by the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-10(1).

84. Defendants did not pay Moses for all services rendered for the benefit of Defendants, nor did Defendants properly pay Moses consistent with the pay he should have been receiving as an Assistant Manager.

85. Defendants failed to pay Moses for time worked, which he was entitled to receive in a timely fashion in the next paycheck after the hours were worked, as required by S.C. Code Ann. § 41-10-40 and -50.

86. Defendants' failure to pay Moses all wages due was willful, without justification, and in violation of the duty of good faith and fair dealing.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

87. Pursuant to S.C. Code Ann. § 41-10-80, Moses is entitled to the unpaid wages including three times the amount of wages to which he is owed (treble damages), attorney's fees, and costs for this specific cause of action.

## FOR A FOURTH CAUSE OF ACTION
### (Violation of the FLSA- Failure to Pay Overtime Wages, S.C. § 201 *et seq.*)

88. Where not inconsistent herewith, the foregoing are realleged paragraphs.

89. Defendants are employers for the purposes of the FLSA.

90. Moses was an employee of Defendants for the purposes of the FLSA during all times relevant to this Complaint.

91. Defendants paid Moses overtime on rare occasions.

92. Moses was working overtime during most weeks that he worked for Defendants.

93. On some occasions, Moses was working 14-16 hours per day.

94. Moses accrued compensatory time worked for which he was not paid. Some of that time amounted to overtime at the rate of one-and-a-half times his normal rate of pay for all hours worked in excess of forty hours per week.

95. Defendants failed to compensate Moses for overtime worked as required by the FLSA.

96. Such actions by Defendants, performed willfully, intentionally, knowingly, and in bad faith, are in violation of the FLSA.

97. The work and pay records of Moses and other employees of Defendants are in the possession, custody, and/or control of Defendants, and Defendants are under a duty pursuant to 29 U.S.C. § 211(c), and pursuant to the regulations of the United States Department of Labor to maintain and preserve such payroll and other employment records from which the amount of Defendants' liability can be ascertained.

ELECTRONICALLY FILED - 2017 Oct 06 2:21 PM - SUMTER - COMMON PLEAS - CASE#2017CP4301806

98.     Moses is entitled to lost wages, compensatory damages, liquidated damages, front pay, attorneys' fees and costs, and any other legal or equitable remedies available under the FLSA.

## PRAYER FOR RELIEF

**WHEREFORE**, Moses prays for judgment against Defendants for back pay, front pay, lost retirement and insurance benefits, and other fringe benefits, liquidated damages, physical and emotional suffering, embarrassment, humiliation, and other compensatory damages in an amount to be determined by a jury as well as an award of punitive damages of the willful, intentional and malicious treatment given to him. Moses last prays for equitable relief, attorney's fees and costs of this action, pre-judgment interest on all damages, and any such other relief as the Court may deem just and proper.

**CROMER BABB PORTER & HICKS, LLC**

BY: _s/Shannon Polvi_____
J. Lewis Cromer (SC Bar #1470)
Shannon Polvi (SC Bar #101837)
1418 Laurel Street, Suite A (29201)
Post Office Box 11675
Columbia, South Carolina 29211
Phone  803-799-9530
Fax     803-799-9533
*Attorneys for Plaintiff*

October 6, 2017
Columbia, South Carolina